UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 19 CR 567 |
| v. | |
| | Honorable Harry D. Leinenweber |
| ROBERT SYLVESTER KELLY, aka "R. Kelly," DERREL McDAVID, and MILTON BROWN, aka "June Brown" | |

## GOVERNMENT'S CONSOLIDATED MOTIONS *IN LIMINE*[1]

The UNITED STATES OF AMERICA, through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully moves the Court, *in limine*, for entry of orders admitting or excluding certain evidence and argument at trial in this case, as set forth below.

**1. MOTION TO PROTECT THE IDENTITIES OF CERTAIN VICTIM-WITNESSES**

The government moves to protect the identities of the victims named in the superseding indictment—referred to as Minor 1, Minor 3, Minor 4, Minor 5, and Minor 6 (the "Victim-Witnesses")—who are expected to provide, and/or will be the subject of, sensitive and personal testimony concerning illegal sexual abuse and the production and receipt of child pornography by the defendants.[2] Specifically, the

---

[1] For purposes of efficiency and ease of reference, the government has filed its motions *in limine* in a single document. No single motion herein exceeds the 15-page limit as imposed by the Local Rules.

[2] The government also intends to raise at the pretrial conference additional courtroom procedures and logistics to accommodate the Victim-Witnesses, such as the use of separate entrances.

government moves the Court to: (1) permit the Victim-Witnesses to testify using their first names only; (2) limit references to each of the Victim-Witnesses in open court to their first names only; and (3) prevent public disclosure, via cross-examination or otherwise, of the Victim-Witnesses' respective addresses, full names of family members, or exact places of employment, if any.

The superseding indictment charges defendant Kelly with multiple counts of sexual enticement and exploitation of the Victim-Witnesses. The Victim-Witnesses are expected to testify in explicit detail and/or be the subject of highly sensitive and personal testimony concerning Kelly's illegal sexual contact with them that occurred when they were between the ages of 13 and 17. Due to the sensitive nature of the testimony and evidence relevant to the crimes charged, the government seeks entry of a proposed protective order limiting the disclosure of the Victim-Witnesses' last names and other identifying information in court. The limited protections requested by the government are necessary and appropriate to protect the Victim-Witnesses' safety and well-being, avoid harassment of the Victim-Witnesses by the press and others, and prevent undue embarrassment and other adverse consequences, such as retaliation by Kelly's supporters, relocation, or loss of employment.

In addition, the government anticipates that Minor 1's mother will testify about similar topics related to Minor 1, including Kelly's long-term abuse of Minor 1 while she was a child. As a result, the government similarly moves to permit Minor 1's mother—who has the same last name as Minor 1—to testify using her first name only. The proposed protective order also contains a provision related to

Individual D, who will testify about, among other topics, sexual contact that she had with Kelly and Minor 1 over the course of several years. The government seeks to preclude disclosure of Individual D's address, names of family members, and place of employment at trial and during pre-trial and post-trial proceedings in this case.

This case was charged in July 2019 and, since that time, the case has garnered significant attention from local and national media sources. The same is true for Kelly's federal prosecution in the Eastern District of New York ("EDNY") (*United States v. Kelly*, Case No. 19 CR 286). In the EDNY case, the court granted the government's motion to exclude references to victims' last names and other personal identifying information during the trial. Case No. 19 CR 286, Dkt. 255, at 19-21 ("In sum, a balancing of the risks to the victim-witnesses against the defendant's interests supported permitting the requested limitations. The victim-witnesses testified about humiliating and explicit acts of abuse, some of which took place when they were minors."). The same protocols are warranted in this case.[3]

Several district courts have excluded mention of victims' full names at trial, citing the privacy interests of the victims. *See, e.g., United States v. Campbell*, 770 F.3d 556, 560 n.1 (7th Cir. 2014) (referencing victims who testified at trial under their real first names); *United States v. Nichols*, No. 15 CR 756, Dkt. 220 (N.D. Ill. Feb. 15, 2018) (in sex trafficking case, protective order entered precluding reference to adult

---

[3] As noted in the government's motion *in limine* number 4 below, it is unknown at this time whether there will be sufficient room for spectators to be seated in the courtroom gallery for this trial. If there are spectators in the gallery, the government requests that the Court admonish any courtroom sketch artists present that there shall be no sketches prepared of the Victim-Witnesses faces while they are testifying. It also may be appropriate to post notice of this order on the courtroom door.

victims' last names and requiring all documents disclosing the last name of any victim to be filed under seal); *United States v. Gardner*, No. 16 CR 20135, 2016 WL 5404207 at *4-5 (E.D. Mich. Sept. 28, 2016) (collecting cases); *United States v. Thompson*, 178 F.Supp.3d 86, 96 (W.D.N.Y. 2016) ("Given the anticipated explicit and sensitive nature of the evidence in this case, the Government has a compelling interest" in limiting identification of the victims.); *United States v. Paris*, 2007 WL 3124724 at *1 (D. Conn. Oct. 24, 2007) (excluding mention of adult and minor victims' full last names at trial, as the government has a "legitimate and substantial" interest in "protecting these witnesses from the likely adverse personal, professional and psychological consequences of publicly linking their identities to their past lives as sex workers.").

As the *Gardner* court held, excluding evidence of the victims' full names is "consistent" with the Crime Victims' Rights Act, 18 U.S.C. § 3771(a)(8), which states that a victim has the "right to be treated with fairness and with respect for the victim's dignity and privacy." 2016 WL 5404207 at *6. Additionally, the government has an interest in encouraging crime victims, particularly victims of sex crimes, to testify by protecting them from some of the adverse consequences of their testimony. *See Thompson*, 178 F.Supp.3d at 96.

While the public has a "constitutional right of access to criminal trials," that right is not "absolute." *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596, 603, 607 (1982). A court can "inhibit the disclosure of sensitive information" when it is narrowly tailored to serve a compelling governmental

interest. *Id.* at 607. In this case, the exclusion of the victims' last names, while otherwise allowing their testimony in open court, is narrowly tailored to serve the interest in protecting the victims' privacy rights. *See Thompson*, 178 F.Supp.3d at 96 ("the Court cannot envision a protective order [barring mention of victims' full last names] that is more narrowly tailored to serve the Government's compelling interests"); *see also Gardner*, 2016 W 5404207 at *4-5 (excluding mention of an adult victim's full last name at trial, explaining that use of the victim's full name "would add nothing substantive to her in-court testimony that cannot be supplied by the use of her first name and first initial of her last name").

For the reasons set forth above, the government respectfully requests that the Court grant the government's motion and (1) permit the Victim-Witnesses and Minor 1's mother to testify using their first names only; (2) limit references to each of the Victim-Witnesses and Minor 1's mother in open court to their first names only; and (3) prevent public disclosure of addresses, full names of family members, or exact place of employment, if any, for the Victim-Witnesses, Minor 1's mother, and Individual D. The government further requests that the Court enter the attached protective order that sets forth the government's requested relief. The proposed protective order supplements the existing protective order in the case, R. 53, which contains several provisions regarding the disclosure of discovery materials produced in this case, including a prohibition on including any information marked as sensitive in any public filing with the Court.[4]

---

[4] Discovery related to the Victim-Witnesses, including their full names and other identifying information, has been produced as sensitive material in this case.

5

2.    MOTION TO PRECLUDE EVIDENCE OF VICTIMS' SEXUAL HISTORY

For the reasons set forth below, defendants should be precluded from eliciting on cross examination or otherwise introducing evidence or making arguments as to the sexual behavior of the Victim-Witnesses with individuals other than Kelly or others at Kelly's direction.

A.    The Evidence is Inadmissible Under Rule 412

By its plain terms, Rule 412 bars evidence of a victim's sexual history and sexual predisposition in cases involving allegations of sexual misconduct:

> The following evidence is not admissible in a civil or criminal proceeding involving alleged sexual misconduct:
>
> (1) evidence offered to prove that any alleged victim engaged in other sexual behavior; or
>
> (2) evidence offered to prove a victim's sexual predisposition.

Fed. R. Evid. 412(a).

The purpose of the rule is to "safeguard the alleged victim against the invasion of privacy, potential embarrassment, and sexual stereotyping that is associated with public disclosure of intimate sexual details," and to "encourage[ ] victims of sexual misconduct to institute and to participate in legal proceedings against alleged offenders." Fed. R. Evid. 412, Advisory Committee Notes; *United States v. Cephus*, 684 F.3d 703, 708 (7th Cir. 2012); *United States v. Elbert*, 561 F.3d 771, 776 (8th Cir. 2009). This purpose is consistent with other provisions of federal law, which provide that all crime victims have "[t]he right to be treated with fairness and with respect for the victim's dignity and privacy." 18 U.S.C. § 3771(a)(8). Consequently, Rule 412

is interpreted broadly, and applies to all sexual behavior of the victim before trial, *United States v. Torres*, 937 F.2d 1469, 1472 (9th Cir. 1991), "whether offered as substantive evidence or for impeachment," Fed. R. Evid. 412, Advisory Committee Notes.

Rule 412 imposes clear limits on a defendant's ability to introduce evidence that a victim engaged in other sexual behavior or has a propensity to engage in sexual acts. In the context of criminal cases, the Rule prescribes very limited exceptions to this inadmissibility:

> The court may admit the following evidence in a criminal case: (A) evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence; (B) evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor; and (C) evidence whose exclusion would violate the defendant's constitutional rights.

Fed. R. Evid. 412(b). If a defendant intends to introduce evidence of a victim's other sexual behavior or alleged sexual predisposition under one of these exceptions, the Rule requires the filing of a sealed motion no less than 14 days before trial that "specifically describes and states the purpose for which it is to be offered," with notice to the victim or her representative. Fed. R. Evid. 412(c)(1).

None of the limited exceptions to Rule 412 apply in this case. Kelly is charged with enticing each of the minors named in the indictment to engage in sexual contact and acts with him, repeatedly, over the course of years. Here, any evidence of a victim's sexual behavior with anyone other than Kelly or others at Kelly's direction, as well as any evidence of any purported "sexual predisposition," would be wholly

irrelevant to the charges against the defendants. The exclusion of evidence on these topics is thus appropriate under Rule 412. *See, e.g., United States v. Isabella*, 918 F.3d 816, 839 (10th Cir. 2019) (in § 2422(b) prosecution, affirming district court's decision to prohibit the introduction of evidence suggestive of the minor victim's "sexual predisposition" and her previous sexual activity with a male depicted in photos on her phone).

### B. The Evidence is Inadmissible Under Rule 403

Even if evidence concerning the victims' other sexual conduct was relevant (it is not), any probative value would be marginal at best and substantially outweighed by the dangers of unfair prejudice, confusion of the issues, misleading the jury, and embarrassing the victim, and it should be excluded pursuant to Rule 403. In particular, such evidence would provide for the substantial risk that the jury will question the victims' sexual morals and view them as untruthful because of their prior sexual activities. For all of these reasons, any inquiry or evidence related to the victims' sexual history is properly excluded under Rule 403.

### 3. MOTION TO BAR EVIDENCE AND ARGUMENT RELATED TO CONSENT

The government requests that the Court prohibit defendants from introducing evidence and arguing that the minor victims consented to engaging in sexual activity while they were minors.

It is well-established that "[m]inors lack the capacity to consent, and so sexual contact with a minor is always without consent." *United States v. Rogers*, 587 F.3d 816, 820 (7th Cir. 2009); *see also United States v. Street*, 531 F.3d 703, 708 (8th Cir.

8

2008) (affirming the district court's exclusion of consent evidence as irrelevant in a prosecution under 18 U.S.C. § 2251(a)); *United States v. Raplinger*, 555 F.3d 687, 691-92 (8th Cir. 2009) ("Because the district court was correct as a matter of law that consent is not a defense to the crimes charged, it was not an abuse of discretion to exclude the consent evidence."); *see also United States v. Key*, 889 F.3d 910, 913 (7th Cir. 2018) ("That the minor consents to engaging in prostitution is not a defense to the crime of trafficking a minor for purposes of prostitution.").

In *Raplinger*, the defendant was charged with sexual exploitation of a minor, in violation of 18 U.S.C. § 2251(a) and (e); distribution of child pornography, in violation of 18 U.S.C. § 2252A(a)(1) and (b)(1); and possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2). The defendant agreed that consent was not a defense to the distribution or possession of child pornography charges, however, at trial, he sought to introduce evidence of the minor's consent as to the sexual exploitation charge. Specifically, the defendant sought to introduce evidence that the minor victim "consented to engage in the sexual behavior and lascivious exhibition." 555 F.3d at 692. On appeal, the Eighth Circuit rejected the defendant's argument that such evidence should have been admitted and concluded that "[b]ecause the district court was correct as a matter of law that consent is not a defense to the crimes charged, it was not an abuse of discretion to exclude the consent evidence." *Id.* The Eighth Circuit further held that the jury was properly instructed that "a minor may not legally consent to being sexually exploited." *Id.* at 692-93.

The Ninth Circuit's decision in *United States v. Dhingra*, 371 F.3d 557 (9th Cir. 2004), is also illustrative. The defendant, charged with enticement of a minor in violation of 18 U.S.C. § 2422(b), proposed a jury instruction that would have required the jury to acquit him if it found that the victim induced him and was at least partially willing to engage in the alleged sexual conduct. *Id.* at 567. The trial court refused to give the instruction. *Id.* In affirming the defendant's conviction, the Court of Appeals wrote:

> [The defendant's] argument collapses because he misconstrues the nature of liability under § 2422(b); his proposed jury instruction reflects this mistake. In effect, [the defendant] claims that entrapment by the victim ameliorates any inducement on his part. Again, this reading of the statute mistakenly changes the focus from the defendant to the victim. The victim's willingness to engage in sexual activity is irrelevant, in much the same way that a minor's consent to sexual activity does not mitigate the offense of statutory rape or child molestation. So long as a defendant's actions constitute the act of persuading, inducing, enticing, or coercing a minor to engage in criminal sexual activity, § 2422(b) applies.

*Id.* at 567-68 (citation omitted).

In *United States v. Dye*, No. 09-3410, 2010 WL 4146187, at *3 (3d Cir. Oct. 22, 2010), the Third Circuit rejected a similar argument. In that case, the defendant was charged with enticing a minor in violation of 18 U.S.C. § 2422(b) and traveling interstate for the purpose of engaging in illicit sexual conduct in violation of 18 U.S.C. § 2423(b). At trial, he admitted to the conduct alleged but argued that the Government's evidence against him was insufficient because the purported minor "was a seductress who had persuaded, induced, and enticed [him], not the other way around." *Id.* at *1. The Third Circuit rejected this defense:

> [The defendant's] "hot to trot" defense is especially troubling because its underlying premise is that it is possible for a 14-year-old child to seduce a 36-year-old man, absolving the man of criminal liability for engaging in, or attempting to talk the minor into engaging in, illicit sexual activity. [The defendant] cites no case law, however, to support the notion that minors—who are, by law, unable to even *consent* to sexual activity, *United States v. Remoi*, 404 F.3d 789, 795 (3d Cir. 2005)—can "ask for it" in such a way that it becomes legally permissible for adults to entice minors into sexual escapades.

*Id.* at *3 n.3 (emphasis in original).

In this case, consent is not a defense to the charges in Counts One through Four and Nine through Thirteen of the superseding indictment. Whether any of the minor victims allegedly agreed to engage in sexual conduct with or at the direction of Kelly is irrelevant to whether Kelly is guilty of violating §§ 2251(a) or 2422(b). Therefore, evidence and argument related to the victims' consent is irrelevant and should be excluded at trial. This includes questions during cross examination of the victims about whether they "consented" to having sex with Kelly or others while they were minors. Such questions would call for witnesses to make legal conclusions and should be barred.

For all of these reasons, the Court should grant the government's motion to bar evidence and argument related to the minor victims' consent. The government will offer instructions on this issue in its proposed jury instructions to be submitted at a later date.

4. **MOTION TO PREVENT THE PUBLIC DISPLAY OF CHILD PORNOGRAPHY VIDEOS DURING TRIAL**

The Court should prevent the publication of child pornography video clips[5] to the gallery during trial.[6] "There is no doubt that criminal trials are public events and that weighty concerns about the fairness and integrity of the proceedings require that criminal trials be open to the public." *United States v. Kerley*, 753 F.2d 617, 620 (7th Cir. 1985). The presumption of openness in criminal trials "is not absolute, however." *United States v. Gupta*, 699 F.3d 682, 687 (2d Cir. 2012). "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise Co. v. Sup. Ct.*, 464 U.S. 501, 510 (1984) (quotation omitted).

Here, the overriding interest is the protection of Minor 1, who is depicted in the child pornography videos that the government intends to introduce at trial. The Supreme Court has found that child pornography creates a permanent record of a victim's abuse, and the very existence of that child pornography "causes the child victims continuing harm by haunting the children in years to come." *Osborne v. Ohio*,

---

[5] Prior to trial, the government will submit the clipped portions and any screenshots of the videos that it seeks to use for review by the Court and defense counsel.

[6] At this time, it is unknown whether there will be sufficient room for spectators to be seated in the courtroom gallery. If there are spectators in the gallery, the government requests that all monitors facing the gallery be turned around or otherwise turned off so that spectators cannot see the child pornography being displayed on the screens. In addition, if there is to be an overflow courtroom where spectators can view this trial, the government requests that the monitors in any overflow room be similarly turned around or turned off while child pornography videos and images are displayed during the trial.

495 U.S. 103, 111 (1990). Victims of child pornography often write about their ongoing anxiety and fear that people who see them in public places will recognize them from the photographs that were taken of them as they were exploited. *See Improving the Response to Victims of Child Pornography, Executive Summary*, The National Center for Victims of Crime at 7, available at https://victimsofcrime.org/doc/Policy/improving-response-to-vcp_executive-summary.pdf?sfvrsn=2 (last visited on June 13, 2021). Although the children cannot control that these images exist, this Court can prevent the images from being publicly displayed during trial.

The government has narrowly tailored its request to serve the victims' interests. The only accommodation that the government seeks is for the Court to limit publication of the sexually explicit videos to the jury and trial participants while avoiding publication to the gallery. The government is not asking for any limitation on testimony describing such images. Requests to limit publication of child pornography are commonly granted. *See United States v. Troup*, No. 12-36, 2012 WL 3818242, at *6 (N.D. Ind. Aug. 31, 2012) (limiting display of child pornography images to the jury and trial participants and finding that "[t]here is no particularly compelling reason why the public would need to see child pornography in the gallery during trial, and it would be detrimental to the minors depicted therein to put their victimization on display"). In *United States v. Siepman*, this Court granted the government's motion to prevent the public display of child pornography images and

clips during the trial in that matter. Case No. 18 CR 130, Dkt. 95 (N.D. Ill. Lenienweber, J.).[7]

Further, preventing the display of child pornography images to the public does not constitute plain error. *United States v. Killingbeck*, 616 F. App'x 14, 16 (2d Cir. 2015) (finding no plain error where "[e]ven assuming that restricting the display of trial exhibits to the courtroom audience constitutes a partial 'closure' for Sixth Amendment purposes, the government presents substantial reasons for doing so-limiting the continuing harm to victims of child pornography"); *United States v. Boyle*, 700 F.3d 1138, 1144 (8th Cir. 2012) (finding no plain error where district court permitted the government to turn off a monitor facing the gallery during the display of allegedly sexually explicit images).

## 5. GOVERNMENT'S INTENDED EVIDENCE OF POLYGRAPH EXAMINATIONS

At trial, the government will present evidence about polygraph examinations that were administered for multiple witnesses who were involved in the recovery of videotapes produced by Kelly containing child pornography.

### A. Factual Background

In summary, Count Five of the superseding indictment alleges that between 2000 and 2019, Kelly and McDavid conspired with each other, Individual A, and others to conceal and cover up the existence of multiple videos depicting Kelly

---

[7] The government is also aware of an oral motion of the government being granted in the following cases: *United States v. Gabriel*, 13 CR 718 (Judge Tharp); *United States v. Norweathers*, 09 CR 1047 (Judge Lefkow); *United States v. Berg*, 07 CR 856 (Judge Bucklo); *United States v. Burns*, 07 CR 556 (Judge Gottschall); and *United States v. Conrad*, 05 CR 931 (Judge St. Eve).

engaged in sexual contact and sexual acts with minors. R. 93 (Superseding Indictment), Count 5 ¶¶ 2-5. In approximately 2001, Kelly and McDavid learned that at least four of these videos—Video 1, Video 2, Video 3, and Video 4—were missing from Kelly's collection of child pornography. *Id.* ¶ 4. In order to conceal and cover up the existence of videos from investigators, Kelly, McDavid, and others agreed to collect the missing videos that depicted Kelly engaged in sexual contact with minors. *Id.* ¶ 5. It is alleged that Kelly and McDavid paid hundreds of thousands of dollars to Individual A, Individual B, Individual C, and Individual D in exchange for obtaining and returning multiple videos that they knew depicted Kelly engaged in sexual contact and sexual acts with minors. *Id.* ¶ 6. As a condition of being paid money for returning the videotapes, the superseding indictment alleges that Kelly and McDavid directed Individual B, Individual C, and Individual D to take polygraph examinations regarding whether they had returned all copies of such videotapes. *Id.* ¶ 6(e). The indictment further alleges that "at the direction of McDavid, on Kelly's behalf, Individual C and Individual D took polygraph examinations regarding the videotapes that Individual C and Individual D had returned depicting Kelly engaged in sexual contact and sexual acts with Minor 1 and Individual D, including whether there were additional copies of the videotapes." *Id.* ¶ 11(c).

At trial, the government will call Individual B, Individual C, and Individual D to testify about their involvement in the conspiracy to recover and return videotapes to Kelly and McDavid depicting Kelly's sexual abuse of Minor 1. Individual B, Individual C, and Individual D will testify about the communications that they had

with the defendants about returning the tapes in exchange for financial compensation. They will testify about how, as a condition to receiving the promised payment, they were required to first take polygraph examinations about whether all such videotapes had been returned to Kelly and McDavid.

The government also plans to call on or more of the polygraph examiners to testify about their involvement in administering the polygraph examinations of Individual B, Individual C, and Individual D. Through these witnesses, the government will introduce testimony and documents related to the polygraph examinations that were administered on behalf of Kelly and McDavid. The documentary evidence, which is described further below, is relevant to the charged conspiracy in that it demonstrates that the witnesses were subject to such examinations about the videotapes as a condition to their promised payments from Kelly and McDavid.

For example, the government anticipates that Individual D will testify that in 2007 she was required to take three polygraph examinations geared at determining whether she had returned all copies of a videotape that she took from Kelly that depicted Individual D having sex with Kelly and Minor 1 ("Video 4"). Individual D will testify that, after passing the first two polygraphs, she received payments from McDavid and Kelly. In order to get the remaining money that she was promised by Kelly and McDavid, Individual D had to take a third polygraph examination. The government seeks to introduce documents related to Individual D's polygraphs, including:

16

- Dated consent forms signed by Individual D, in which she agreed to take the polygraph examinations and release the results to Kelly's attorney at the time.

- Pre-examination interview forms completed by the examiner, containing some general background information about Individual D.

- The examiner's notes listing the questions that he asked Individual D during the polygraph examinations.

These documents are relevant to show the dates that the polygraphs were administered; who administered them; and who would receive the results of the exams. In particular, the questions that were asked during the examinations are relevant to establish the purpose of the polygraph examinations.

As another example, the government plans to call Individual C to testify about how Individual D sent him a copy of the videotape that she took from Kelly containing the video of Kelly, Individual D, and Minor 1 having sex. After Individual C received the tape, he was summoned to Chicago to meet with McDavid about returning the tape. Individual C is expected to testify that, before he left for Chicago, he made a copy of the full-length tape and only brought a shorter snippet of the tape with him to Chicago. According to Individual C, once he arrived in Chicago, he provided the snippet to McDavid who went into another room with Individual D. When McDavid returned, he told Individual C that he would have to take a polygraph examination. Individual C will testify that, after he took the polygraph and failed, McDavid instructed Individual C to go home and get the original tape or else someone would come "visit" him. Individual C understood McDavid's statement to be a threat. Individual C will further testify that, before he left that day, McDavid paid

17

Individual C $20,000 in cash as a down payment for going back to get the original tape for McDavid and Kelly.

The government anticipates that Individual C will testify about the events that occurred after he returned to Chicago with the original tape. Specifically, Individual C is expected to testify that he was required to take another polygraph examination about whether he had any other copies of the tape. According to Individual C, he passed the second polygraph and McDavid paid Individual C $80,000 in cash. The documents created as a result of Individual C's polygraph examinations, including the consent forms that Individual C signed and the examiner's notes regarding his administration of the polygraphs, confirm Individual C's trips to Chicago and meetings with McDavid and are direct evidence of the conspiracy to conceal and cover up Kelly's sexual abuse of minors.

## B.     Argument

In this case, defendants used polygraph examinations as a tool to further their conspiracy to obstruct justice and recover illicit videotapes of Kelly engaged in sexual contact with Minor 1. During the conspiracy, defendants retained multiple examiners to administer polygraphs to multiple witnesses in this case—many of whom were subjected to more than one polygraph. This evidence demonstrates how serious defendants were about recovering the missing child pornography tapes and is admissible to show consciousness of guilt.

The government seeks to introduce evidence and testimony about the polygraph examinations for purposes wholly unrelated to the substantive correctness

of the results of the polygraph examination. The government will not elicit testimony from witnesses about whether the results of the tests were scientifically accurate. The purported results are only relevant insofar as they provide important context as to (1) why McDavid required individuals to take multiple tests, and (2) why McDavid paid large sums of cash to individuals after it was reported that they "passed" the examinations. The government further represents that it will not use the results of the polygraphs to bolster the credibility of any witness and will not make any arguments regarding the scientific reliability of polygraph examinations at trial.

Admission of the polygraph evidence for the limited reasons set forth above is permitted under Seventh Circuit law. The Seventh Circuit has "given district courts considerable deference on the issue, indicating that the decision to admit polygraph evidence will be reversed only when the district court has abused its discretion." *United States v. Resnick*, 823 F.3d 888, 897 (7th Cir. 2016) (internal quotations omitted). In *Resnick*, the government presented evidence that, during the execution of a search warrant on the defendant's home, law enforcement asked the defendant to take a polygraph examination, and defendant refused to take one. *Id.* In affirming the court's admission of this evidence at trial, the Seventh Circuit reasoned that "this case is not in the end about polygraph evidence: it is about evidence of a *refusal* to take a polygraph." *Id.* (emphasis in original).

The same principle applies here. The government is not seeking to use the results of the polygraph examinations for their scientific value or to bolster the credibility of any witness. Rather, as alleged in the superseding indictment, Kelly and

McDavid caused examiners to administer polygraph examinations in furtherance of their conspiracy to obstruct justice. *See* R. 93, Count 5 ¶¶ 6(e), 11(c).

It is also important to highlight that the offered polygraph evidence does not relate to polygraphs of any of the *defendants* in this case. As a result, there is no risk that the jury could make adverse inferences about the defendants' credibility, as the government is not offering evidence that any of the defendants took polygraphs. *Cf. United States v. Bowen*, 857 F.2d 1337, 1341 (9th Cir. 1988) (affirming exclusion of evidence that defendant took a polygraph under Rule 403 because even if the facts about an exam were admitted without the results the jury would still be reasonably likely to infer that *defendant* failed the polygraph).

In sum, evidence of where, when, how, and why the polygraphs of Individual B, Individual C, and Individual D were administered is probative evidence of the conspiracy charged in the indictment—including, for example, one of the alleged overt acts that McDavid, acting on Kelly's behalf, directed Individual C and Individual D to take polygraph examinations—and, as such, this evidence should be admitted at trial.

## 6. NOTICE REGARDING INTRODUCTION OF THE FALSE RECORDS ALLEGED IN THE SUPERSEDING INDICTMENT

The government provides notice that it will seek to introduce certain false records alleged in Count Five of the superseding indictment.

First, the government provides notice that it will seek to admit a memorandum summarizing an interview of Individual D that took place on or about July 26, 2007. This memorandum, which is not hearsay, is relevant to prove that McDavid and Kelly

conspired to obstruct justice as alleged in Count Five of the superseding indictment. Particularly relevant to this motion is the allegation in the superseding indictment that, "[o]n or about July 26, 2007, Kelly and McDavid directed Individual D to falsely deny that Individual D and Kelly engaged in sexual acts together with Minor 1, when Kelly and McDavid knew that Kelly had engaged in sexual acts with Minor 1 and Individual D. As Kelly and McDavid intended, a false record, document and tangible object was prepared based upon Individual D's false statements." R. 93, Count 5 ¶ 7(e). The memorandum of Individual D's interview is the false document referred to in the superseding indictment.

As set forth above, Individual D was summoned to Chicago multiple times in 2007 in connection with McDavid and Kelly's efforts to collect contraband videotapes and impede the Cook County criminal prosecution in 2008. Individual D was required to take multiple polygraph examinations to assure Kelly and McDavid that she had returned the video she took from Kelly that depicted herself, Kelly, and Minor 1 engaging in sex acts while Minor 1 was around 14 years old.

Individual D is expected to testify at trial in this case that, following her third polygraph examination on or about July 26, 2017, McDavid told her to meet with other lawyers and tell them that she never had sex with Minor 1. Individual D is expected to testify that McDavid waited in the hallway as she went in the room to meet with the lawyers and provide them with the false statements as instructed by McDavid. A memorandum of interview dated July 26, 2007 was prepared

documenting Individual D's false statements. In summary, the memorandum states that Individual D provided the following information:

- Between 1997 and 2006, Individual D had sex with Kelly and multiple other females, all of whom were over the age of 17.

- Individual D knew Minor 1 and had spoken to her on numerous occasions. Individual D never saw Kelly in a sexual situation with Minor 1. Minor 1 was never a participant in any sexual encounter with Individual D and Kelly.

- Individual D agreed to be interviewed by attorneys on July 26, 2007. Individual D was not forced, threatened, or promised anything to participate in this interview.

At trial, the government will question Individual D about this memorandum and the lay the foundation for the memorandum's admission into evidence. The memorandum should be admitted, as the statements therein are not being offered for their truth. Quite the opposite, the government seeks to use this document as evidence that she was coerced by McDavid and Kelly to provide false information about her knowledge of Minor 1 and Kelly's abuse of Minor 1. The government's evidence will further show that, on or about July 26, 2007, Individual D received a $30,000 payment from McDavid.

In addition, the memorandum is not privileged. After the memorandum was prepared, Kelly's attorney at the time provided the memo to the Assistant State's Attorney assigned to Kelly's criminal trial in Cook County. The Cook County State's Attorney's Office, in turn, provided a copy of the memo, along with the correspondence from Kelly's attorney, to the U.S. Attorney's Office, and the memo has been produced to the defendants in this case.

Second, the government provides notice that it will seek to admit a police report containing false information provided by Minor 1 during the Chicago Police Department's investigation of Kelly in 2000. As alleged in the superseding indictment, "[i]n approximately December 2000, pursuant to instructions that Minor 1 received from Kelly, Minor 1 falsified and caused a false entry to be made in a police report, when Minor 1 denied to law enforcement officers that Kelly engaged in a sexual relationship with Minor 1." R. 93, Count 5 ¶ 7(a). At trial, Minor 1 is expected to testify that Kelly began having sexual contact with her beginning around 1997 or 1998, when Minor 1 was 13 or 14-years old. When Minor 1 was about 15 or 16 years old, in or about 2000, certain government agencies began investigating allegations that Kelly was sexually abusing Minor 1. Kelly instructed Minor 1 on how to act and what to say if she was questioned. In or around December 2000, law enforcement officers from the Chicago Police Department questioned Minor 1 about sexual contact with Kelly. During the interview with CPD, Minor 1 falsely denied the allegations of Kelly's sexual misconduct and documented that information in a police report. In summary, the police report states that law enforcement interviewed Minor 1, who stated that she had never been sexually abused by Kelly and that any such allegations are untrue.

At trial, the government will seek to admit the CPD report into evidence. Admission of this report is permissible as it is not hearsay, and is being offered to prove allegations in the superseding indictment.

For all of these reasons, the above-described records should be admitted into evidence.

## 7. GOVERNMENT'S NOTICE OF INTENT TO ADMIT DIRECT EVIDENCE OF CRIMES CHARGED

As set forth in the superseding indictment, Kelly is charged with multiple crimes related to his sexual abuse and exploitation of five minors over the course of several years (Counts 1-4, 6-13). The indictment further alleges that McDavid knew that Kelly was sexually abusing minors and that Kelly made several videotapes documenting the abuse (Count 5). Kelly and McDavid went to great lengths to cover up the abuse, including paying large sums of money to witnesses to ensure that they would lie to law enforcement about the criminal conduct. In furtherance of Kelly and McDavid's conspiracy to obstruct justice, it is alleged in the superseding indictment that "Kelly used physical abuse, violence, threats of violence, blackmail, and other controlling behaviors against victims so that Kelly could maintain control over them, prevent them from providing evidence to law enforcement, and persuade them to continue to abide by prior false statements relating to Kelly's sexual contact and sexual acts with minors and videos of such conduct." R. 93, Count 5 ¶ 9.

At trial, the government will introduce testimony and evidence of the physical, emotional, and sexual abuse that Kelly inflicted on Minors 1, 3, 4, 5, and 6 over the course of several years. The victims will testify about how Kelly used violence and threats of violence to control, manipulate, and isolate them, all as a means to coerce the victims to have sex with Kelly and prevent them from reporting Kelly to the police. For example, the government expects that Minor 1 will testify that Kelly began

24

hitting her when she around 17 or 18-years old. Minor 1 will also testify about how Kelly isolated her from her family and friends and controlled her every move, including who Minor 1 was allowed to talk to. As another example, Minor 5 will describe the strict rules that Kelly had regarding who Minor 5 was allowed to speak to and that Minor 5 had to seek Kelly's permission before interacting with other men. According to Minor 5, there was one instance where Kelly punched a man after he told Minor 5 that he thought Minor 5 was cute.

In short, Kelly used physical violence and emotional manipulation to entice and coerce the victims to have sex with him. Thus, testimony about how Kelly hit or otherwise inflicted physical violence against the victims is direct evidence of the § 2422(b) charges.

Evidence of Kelly's physical abuse is also direct evidence of the charged conspiracy to obstruct justice which alleges that, between approximately 2000 and 2019, Kelly "used physical abuse, violence, threats of violence, blackmail, and other controlling behaviors against victims so that Kelly could maintain control over them, prevent them from providing evidence to law enforcement, and persuade them to continue to abide by prior false statements relating to Kelly's sexual contact and sexual acts with minors and videos of such of conduct." R. 93, Count 5 ¶ 9. As a result, Minor 1's testimony about Kelly's physical and emotional abuse of her while she was an adult is also direct evidence of the § 371 charge.

8.    MOTION FOR PRIOR NOTICE CONCERNING RULE 608(B) IMPEACHMENT

The government moves to bar each party from introducing evidence (including by asking questions on cross examination) under Rule 608(b) except upon prior notice to the Court and the opposing party outside the presence of the jury. Rule 608(b) provides that specific instances of past conduct may be inquired into on cross-examination if (and only if) they concern the witness' character for truthfulness. By its very nature, impeachment based upon a witness' prior conduct that is not relevant to the matter at issues creates a risk of causing unfair prejudice to an opposing party. First, a party attempting to conduct such impeachment may erroneously believe that such impeachment is appropriate when it is not—the end result being that the impropriety of the impeachment is only discovered after the disparaging impeaching conduct is presented to the jury as part of an attorney's question. Second, even if some conduct may properly fall within the scope of Rule 608(b), counsel may exceed any limitations on the scope to which such matters may be addressed on cross-examination. Third, depending on the nature of the past conduct raised by the examiner, the jury may not be able to completely obey the Court's instruction to disregard the contents of an improper question heard by the jury.

For these reasons, and to obviate any risk of unfair prejudice, the government asks that this Court exercise its discretion to preclude the parties from pursuing any impeachment under Rule 608(b) unless, outside the presence of the jury, the party has made a prior offer of proof concerning the alleged prior conduct. See Fed. R. Evid. 611 ("The court should exercise reasonable control over the mode and order of

examining witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."). Procedurally, the government proposes that, prior to cross-examination, the Court should require each party to first notify the Court and other parties at sidebar of its intent to impeach under Rule 608(b). This procedure would ensure that any alleged prior bad acts are not improperly communicated to the jury before the Court has the opportunity to determine whether such alleged prior bad acts are the subject of proper impeachment under Rule 608(b).

9. **MOTION TO PRECLUDE ARGUMENT OR EVIDENCE DESIGNED TO ELICIT JURY NULLIFICATION**

The government moves this Court to preclude the defendant from arguing, or otherwise presenting evidence or pursuing lines of inquiry designed to elicit jury nullification. It is well settled that it is improper for a defendant to suggest in any way that the jury should acquit defendant even if it finds that the government has met its burden of proof. See *United States v. Laguna*, 693 F.3d 727, 730 (7th Cir. 2012) (court held that district court properly found that evidence offered by the defendant was irrelevant and served to only confuse the jury or invite the jury to acquit even if the government satisfied each element of the offense); *United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996) ("An unreasonable jury verdict, although unreviewable if it is an acquittal, is lawless, and the defendant has no right to invite the jury to act lawlessly. Jury nullification is a fact, because the government cannot appeal an acquittal; it is not a right, either of the jury or of the defendant."); *United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir. 1993) (holding that the court "may

27

block defense attorneys' attempts to serenade the jury with the siren of nullification").
Therefore, the defendant should be precluded from presenting argument or evidence
designed to elicit jury nullification.

The government cannot anticipate each form of potential jury nullification
argument or evidence. The government moves to exclude the potential areas noted
below, all of which are irrelevant to the elements of the crimes charged, as well as
any argument or questioning, no matter what its form, that, in effect, would
"encourage a jury to acquit 'under any circumstances' regardless of the applicable law
or proven facts." *United States v. Anderson*, 716 F.2d 446, 450 (7th Cir. 1983) (quoting
*United States v. Dougherty*, 473 F.2d 1113, 1137 (D.C. Cir. 1972)).

### A.   Motion to Preclude Argument or Evidence Concerning Potential Penalties Faced by Defendants if They are Convicted

The government moves the Court to preclude defendants from introducing
evidence, making argument, or otherwise mentioning the potential penalties faced if
convicted. For one, the Seventh Circuit's Pattern Criminal Jury Instructions include
an instruction specifying, "In deciding your verdict, you should not consider the
possible punishment for the defendant. If you decide that the government has proved
the defendant guilty beyond a reasonable doubt, then it will be my job to decide on
the appropriate punishment." Pattern Crim. Jury Instructions 4.08 (2020 ed.).

Additionally, the Seventh Circuit has stated that "arguing punishment to a
jury is taboo." *United States v. Richardson*, 130 F.3d 765, 778 (7th Cir. 1997), vacated
on other grounds, 526 U.S. 813 (1999); *see also United States v. Lewis*, 110 F.3d 417,
422 (7th Cir. 1997) ("[T]he practice of informing juries about the sentencing

28

consequences of their verdicts is strongly disfavored."); *United States v. McKenzie*, 922 F.2d 1323, 1327 (7th Cir. 1991) (holding that while "the sixth amendment requires that a jury determine questions of guilt or innocence . . . punishment is the province of the Court").

Argument and evidence concerning punishment are improper because the law is well-settled that the potential penalty faced by a defendant is irrelevant to the jury's determination of guilt or innocence. *See, e.g., Shannon v. United States*, 512 U.S. 573, 579 (1994) ("It is well established that when a jury has no sentencing function, it should be admonished to reach its verdict without regard to what sentence might be imposed.") (quotation omitted); *Aliwoli v. Carter*, 225 F.3d 826, 830 (7th Cir. 2000) (same); *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1991) ("It has long been the law that it is inappropriate for a jury to consider or be informed of the consequences of their verdict."). Mention of the potential penalties faced by defendants only would serve the improper purpose of jury nullification. *See, e.g., United States v. Reagan*, 694 F.2d 1075, 1080 (7th Cir. 1982) ("The authorities are unequivocal in holding that presenting information to the jury about possible sentencing is prejudicial.") (quotation omitted).

Accordingly, the defense should be precluded from mentioning or introducing evidence about any of the range of penalties faced if convicted.

### B. Motion to Preclude Allegations of Outrageous Government Conduct

The government moves to exclude evidence or argument by counsel of "outrageous government conduct." The Seventh Circuit repeatedly has held that the

"[o]utrageous government conduct is not a defense in this circuit." *United States v. Stallworth*, 656 F.3d 721, 730 (7th Cir. 2011) (citation omitted); *see also United States v. Sherman*, 268 F.3d 539, 549-550 (7th Cir. 2001); *United States v. Boyd*, 55 F. 3d 239, 241-42 (7th Cir. 1995) ("[O]utrageous governmental misconduct" is no defense to a criminal charge, and the jury thus should not be exposed to irrelevant allegations of this sort.). Furthermore, this Circuit held that the issue of government misconduct was a matter of law for determination by the court: "the issue of government misconduct is not an issue for the jury." *United States v. Swiatek*, 819 F.2d 721, 726 (7th Cir. 1987) (noting that every circuit which has considered the issue has held that the issue is not a jury question) (citations omitted).

Yet, there is a "tendency in criminal cases to try some person other than the defendant and some issue other than his guilt." *United States v. Griffin*, 867 F. Supp. 1347, 1347 (N.D. Ill. 1994) (citation omitted). The "thrust of the defense" in these types of cases "is this: the prosecution was not nice or could have done it better and so the jury ought to acquit, whether or not guilt has been proved beyond a reasonable doubt." *Id.* In the face of this tendency to interject themes of "government misconduct" into a defense strategy, courts routinely have granted motions *in limine* "to bar defendants from presenting evidence or making arguments to the jury suggesting that they should be acquitted because the government engaged in misconduct in the course of its investigation." *United States v. Shields*, 1991 WL 236492, at *3 (N.D. Ill. Aug. 13, 1991). *See also United States v. Finley*, 708 F. Supp. 906, 913 (N.D. Ill. 1989) (granting motion *in limine* to preclude evidence "which is not relevant to defendants'

guilt but is designed only to persuade the jury that defendants should be acquitted because the government engaged in misconduct during its investigation").

Accordingly, the government moves to bar the defense from introducing evidence or argument of outrageous government conduct.

### C. Motion to Preclude Argument and Evidence Regarding the Government's Motivation in Investigating & Prosecuting the Case

The government moves to preclude evidence or argument by defense counsel regarding the government's and the officers' and agents' motivations for investigating or prosecuting this case. This includes, but is not limited to, arguments that the federal prosecution of defendants for child pornography offenses after Kelly's acquittal in Cook County Circuit Court is vindictive or otherwise improper. Evidence bearing on the government's decision to prosecute is "extraneous and collateral" and thus, excluded from trial. *See United States v. Johnson*, 605 F.2d 1025, 1030 (7th Cir. 1979) (affirming the exclusion of evidence offered to show that the "indictment was a political instrument"); *United States v. Clay*, 618 F.3d 946, 956 (8th Cir. 2010) ("[S]elective prosecution of a criminal defendant is not an issue for the jury to decide.").

Further, the government moves to preclude the defense from arguing or eliciting evidence regarding the mental states, subjective intentions, or motivations, of the investigating officers and agents. It is well settled law that inquiries regarding the subjective intentions or motivations of a government agent are irrelevant to determining the factual guilt or innocence of a defendant. *See United States v.*

*Goulding*, 26 F.3d 656, 667 (7th Cir. 1994) (even in the context of an entrapment defense, it was proper for the trial court not to "allow the defense to mount an inquiry into the mental states of the investigating officers since such evidence was irrelevant").

Accordingly, the government moves to preclude evidence or argument by the defense regarding the government's and the officers' and agents' motivations for investigating or prosecuting the case.

### D.   Motion to Preclude Argument and Evidence of Selective Prosecution Theory

Similarly, defendant should be precluded from introducing evidence or argument seeking to present a theory of selective prosecution before the jury. During the trial, the government intends to call witnesses who, for example, participated in the conspiracy to receive child pornography. The government anticipates that defendant may argue that some of these witnesses may have been engaged in unlawful receipt of child pornography and have not been charged with any criminal offenses. Pursuant to Federal Rules of Evidence 401 and 403, such information is irrelevant and unfairly prejudicial.

Indeed, in *United States v. Young*, 20 F.3d 758, 765 (7th Cir. 1994), the court granted, on relevancy grounds, the government's motion to preclude the defendant from introducing evidence that another individual who had been arrested with him was not charged. In so ruling, the *Young* court noted that "the primary issue for the jury was whether the government met its burden of proof as to [the defendant]'s knowledge," and "[w]hether or not [another individual] was criminally charged [did]

not make the facts related to [the defendant's] knowledge and participation in [the alleged crime] more or less probable." *Id.* at 765; *see also United States v. Abboud*, 438 F.3d 554, 579 (6th Cir. 2006) (observing that "the defense of selective prosecution is a matter that is independent of a defendant's guilt or innocence, so it is not a matter for the jury").

In the same vein, defendants should be precluded from making legally irrelevant and prejudicial arguments regarding the parents of Minors 1, 3, 4, 5, and 6. To prove the offenses alleged in the superseding indictment, the government expects to present evidence that some of the minor victims spent a substantial amount of time with defendants and that defendants may try to deflect the blame for their criminal conduct by offering evidence that the parents of the minor victims knew or should have known about their daughters' sexual relationships with Kelly. Defendants may further assert that to the extent the parents knew or should have known about the sexual relationships with Kelly, the parents thereby consented to such relationships. Such evidence has no legal bearing as to the offenses with which defendants are charged. Indeed, consent by either the parents or the minor victims is not a defense to such charges. Defendants may go so far as to argue that the parents of the minor victims were responsible for or aided and abetted defendants' crimes. Such arguments are legally irrelevant and would only serve as a distraction to the jury.

For all of these reasons, the government moves to preclude evidence or argument by the defense regarding any theory of selective prosecution.

10. **MOTION TO PRECLUDE DISCOVERY REQUESTS OR COMMENTARY REGARDING DISCOVERY IN THE PRESENCE OF THE JURY**

The government moves this Court to preclude the parties from requesting discovery from witnesses or opposing counsel, moving the Court for such discovery, or otherwise commenting on discovery matters, in the presence of the jury. Such requests in front of the jury may distract the jury or create the impression that one side has suppressed information as a means of seeking an unfair advantage. *See, e.g., United States v. Gray*, 2010 WL 1258169, *3 (N.D. Ind. Mar. 26, 2010) (granting government's motion to preclude the defense from requesting or commenting on discovery in the presence of the jury); *see also Thompson v. Glenmede Trust Co.*, 1996 WL 529693, at *2 (E.D. Pa. Sept. 17, 1996) ("Rather than focus on the issues in the case, the jury may instead be misled by the irrelevant side issues of the discovery process. Therefore, the Court will not permit either party to refer to the discovery process in the presence of the jury at trial.").

As such, the government asks this Court to prohibit either party from raising discovery issues in the presence of the jury. The appropriate time to raise such issues would be at a sidebar or while the jury is not in the courtroom.

11. **MOTION TO EXCLUDE EVIDENCE OR ARGUMENTS REGARDING THE CONSTITUTIONALITY OF THE STATUTES CRIMINALIZING THE PRODUCTION AND RECEIPT OF CHILD PORNOGRAPHY**

Arguments pertaining to the constitutionality of the statutes criminalizing child pornography offenses are wholly irrelevant to the indictment in this case and do not affect the Supreme Court's and Seventh Circuit's unequivocal rulings that the First Amendment and the Commerce Clause do not protect child pornography. *See,*

*e.g., Osborne v. Ohio*, 495 U.S. 103, 111 (1990) (rejecting a First Amendment challenge and upholding the constitutionality of laws prohibiting the possession and viewing of child pornography); *United States v. Angle*, 234 F.3d 326, 335-38 (7th Cir. 2000) (rejecting a commerce clause challenge to a conviction for possessing child pornography). For these reasons, the government moves to preclude defendants from introducing any evidence or argument regarding the constitutionality of the statutes criminalizing the production and receipt of child pornography.

## 12. MOTION TO PRECLUDE ARGUMENT OR EVIDENCE OF NON-PERTINENT TRAITS OF DEFENDANTS' CHARACTERS

The government moves the Court to exclude all evidence offered by defendants of their lawfulness and/or non-corrupt conduct, except reputation or opinion evidence offered by character witnesses strictly in accord with the limitations of Federal Rules of Evidence 405(a).[8] Other than testimony from character witnesses fitting within the narrow confines of Rule 405(a), no such evidence is admissible.

Rule 404(a)(1) precludes the admissibility of evidence of a person's character or character trait "to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a)(1). Rule 404(a)(2) directs, in relevant part, that "[d]efendant may offer evidence of the defendant's pertinent

---

[8] Even evidence offered under Rule 405(a) cannot include specific instances of good conduct: it is limited to a description of the subject's reputation or to a brief statement of opinion, without support from specific instances of conduct. *See* Advisory Committee Notes to Rule 405 (The rule "contemplates that testimony of specific instances is not generally permissible on direct examination of an ordinary opinion witness to character . . . [O]pinion testimony on direct in these situations ought in general to correspond to reputation testimony as now given, i.e. be confined to the nature and extent of observation and acquaintance upon which the opinion is based.").

trait." Fed. R. Evid. 404(a)(2)(A). Pursuant to this rule, only pertinent character traits of defendants are admissible, and all non-pertinent traits are inadmissible. For example, in an effort to distract the jury from the charges at issue, defendants may seek to call witnesses to testify that on particular prior occasions defendants followed the law or otherwise behaved as lawful members of the community. Any evidence or argument of this sort is inadmissible, and the Court should exclude it. The law is clear: "Evidence that a defendant acted lawfully on other occasions is generally inadmissible to prove he acted lawfully on the occasion alleged in the indictment." *United States v. Reese*, 666 F.3d 1007, 1020 (7th Cir. 2012); *see also United States v. Heidecke*, 900 F.2d 1155, 1162 (7th Cir. 1990) ("Proof that a defendant acted lawfully on other occasions is not necessarily proof that he acted lawfully on the occasion alleged in the indictment."). To hold otherwise would be to eviscerate the carefully drafted limitations of Rule 405, which forbid proof of good character through evidence of specific acts where character is not an element of the charge or defense. Like Rule 403, Rule 405 is intended to prevent the series of wasteful "mini-trials' which would inevitably ensue if defendants were allowed to introduce irrelevant testimony of non-pertinent traits of character.

Accordingly, the government moves to bar defendants from presenting argument or introducing evidence of character traits of defendants that are non-pertinent to refuting the elements of the offenses for which they are charged.

13. **MOTION TO PRECLUDE DEFENSES OF ALIBI OR UNAVAILABILITY AND MENTAL DEFECT**

Rules 12.1 and 12.2 of the Federal Rules of Criminal Procedure require that a defendant provide the government with notice of the following defenses: (1) any alibi or similar defense that the defendant intends to raise, including any defense asserting the defendant's unavailability on or near the dates named in the indictment (Rule 12.1); and (2) notice of any defense to be raised of a mental defect inconsistent with the state of mind required for the offense charged (Rule 12.2).

On or about August 2, 2019, the government sent letters to defense counsel requesting notice pursuant to Rules 12.1, 12.2, and 12.3 of each of these defenses. The defendants have not notified the government of their intent to raise any such defenses. The government thus requests that the defendants be prohibited from introducing evidence or argument relating to such defenses at trial.

14. **MOTION TO PRECLUDE DEFENSE COUNSEL FROM DEFINING THE TERM "REASONABLE DOUBT"**

The government moves the Court to order the defense not to attempt to define the term "reasonable doubt" during opening statement or closing argument. The term "reasonable doubt" should not be defined by the trial court or counsel. *E.g., United States v. Anderson*, 303 F.3d 847, 857 (7th Cir. 2002); *United States v. Reynolds*, 64 F.3d 292, 298 (7th Cir. 1995). That is because any attempt to define the term "presents a risk without any real benefit"—that is, any definition of the term often leans toward "misleading refinements" that "weaken and make imprecise the existing phrase." *Reynolds*, 64 F.3d at 298 (internal quotations omitted); *see also Anderson*,

303 F.3d at 857 (government argument was proper because "it was invited by defense counsel's own improper attempt to define the reasonable doubt standard"); *United States v. Blackburn*, 992 F.2d 666, 668 (7th Cir. 1993) (noting that definitions of reasonable doubt have a likelihood of "confus[ing] juries more than the simple words themselves"). For these reasons, the Seventh Circuit has held that "it is improper for attorneys to attempt to define the term [reasonable doubt]." *United States v. Thompson*, 117 F.3d 1033, 1035 (7th Cir. 1999); *see also United States v. Clancy*, 1999 WL 265164, at *8 (7th Cir. 1999); *United States v. Bruce*, 109 F.3d 323, 329 (7th Cir.1997); *United States v. Alex Janows & Co.*, 2 F.3d 716, 722–23 (7th Cir. 1993) ("It seems simple enough; we admonish counsel, do not define 'reasonable doubt' to a jury."); Committee Comment to Seventh Circuit Pattern Criminal Jury Instruction 1.04 (2020 ed.).

## 15. Motion to Allow Government to Recall the Case Agent During Its Case-In-Chief

The government respectfully requests permission from the Court to recall the case agent, a special agent from Homeland Security Investigations, during the course of trial so that testimony can be presented to the jury in an orderly and understandable manner, and in a manner most effective for ascertaining the truth.

This Court has substantial discretion to determine the mode and order of interrogation. *See United States v. Vasquez*, 635 F.3d 889, 897 (7th Cir. 2011); *United States v. Puckett*, 147 F.3d 765, 770 (8th Cir. 1997) (upholding district court's decision to allow government to recall law enforcement witnesses so the evidence could be presented in chronological order). Federal Rule of Evidence 611(a) provides in part:

> The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to make those procedures effective for determining the truth; [and] avoid wasting time[.]

Fed. R. Evid. 611(a). The procedure of permitting witnesses to testify in episodic or chronological order has been approved in complex conspiracy cases. *See, e.g., United States v. Jackson*, 549 F.2d 517, 528 (7th Cir. 1977); *see also United States v. Butera*, 677 F.2d 1376, 1381 (11th Cir. 1982).

Because the government intends to introduce, to the extent possible, evidence related to the conspiracy—which spans almost 20 years—and the substantive child exploitation charges chronologically, the government anticipates it will need to recall the case agent to testify about, among other things, voluminous bank and financial records, other business records from dozens of sources, and multiple videos containing child pornography. While the government will attempt to limit the number of times it recalls the case agent as best it can, requiring her to testify only once would necessarily require the government to cover a broad number of topics out of chronological order in a fashion that would likely confuse the jury.

Accordingly, the government respectfully requests that the Court permit it to recall the case agent to testify to the relevant episodes of the government's investigation. The government further proposes that after each instance of direct examination, the defendants be permitted to cross-examine the witness fully about any and all matters the witness testified about during that particular direct examination so as to ensure a full and fair cross-examination.

16.    **MOTION TO ADMIT BUSINESS RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 803(6) AND 902(11)**

Under Federal Rule of Evidence 902(11), certified copies of domestic business records are self-authenticating if the party offering the records provides the adverse party written notice and allows the adverse party to inspect the exhibit and certification, allowing the party to challenge the authenticity of the records.[9] Under Federal Rule of Evidence 803(6), the records are an exception to the hearsay rule if following conditions exist:

> (A) the records was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of the information nor the method or circumstances of preparation indicate a lack of trustworthiness.

The Seventh Circuit has consistently upheld the admission of business records through business records certifications, pursuant to Rules 803(6) and 902(11). *See, e.g., United States v. Green*, 648 F.3d 569, 580-81 (7th Cir. 2011); *United States v. Klinzing*, 315 F.3d 803, 809-10 (7thCir. 2003) (holding that admission of pre-certified business records under Rules 803(6) and 901(11) does not violate the Confrontation Clause because the records have "sufficient guarantees of reliability"); (*United States*

---

[9] This motion constitutes written notice to defendants that the government intends to rely on business records certifications for the identified records.

*v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006) (Seventh Circuit upheld the admissibility records through the use of Rule 902(11) certifications in light of *Crawford*).

The government moves the Court to find, pursuant to Federal Rule of Evidence 104, that the records at issue are authentic business records within the meaning of Federal Rule of Evidence 803(6). Rule 104 authorizes the Court to determine in advance of trial "[p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence." This rule applies to all preliminary determinations, including the question of whether documents fall within the "business records exception" to the hearsay rule. *See United States v. Kasvin*, 757 F.2d 887, 893 (7th Cir. 1985) (affirming trial court's preliminary determination pursuant to Rule 104 that business records were admissible pursuant to Rule 803(6)).

The government intends to introduce a variety of business records through certifications, including the records of state agencies, financial institutions and companies, and hotel and other travel records. Government Exhibit 1 is a chart of businesses records for which the government intends to rely on business records certifications under Rules 803(6) and 902(11). The business records certifications for records identified in the chart have been previously produced to defendant in discovery. The government will send them to defense counsel again under separate cover. The chart in Government Exhibit 1 also identifies the business records that are associated with each certification. The underlying business records have all previously been produced to defendants in discovery.

The government intends to introduce selected portions of the business records identified in the chart at trial. Additionally, the government may supplement this notice as additional business records certifications are received from business custodians of record.[10] Admission of these documents through 902(11) certification will save the parties, the Court, and the jury members significant time and resources, as the certifications will obviate the need for live witness testimony from several witnesses.[11]

Because the business records from the entities listed in Government Exhibit 1, and their accompanying certifications, fall under Federal Rules of Evidence 902(11) and 803(6), the government respectfully requests that this Court find, under Rule 104, that the identified business records fall within the "business records exception" to the hearsay rule.

---

[10] The government will provide defendants with any additional certifications as they are received, and the Seventh Circuit has allowed notice to be provided only days before trial. *See United States v. Bledsoe*, 70 Fed. Appx. 370, 373 (7th Cir. 2003) (Seventh Circuit upheld the admission of business records pursuant to 902(11) certifications even though the government gave defendant notice of its intent to use the certification only four days prior to trial).

[11] The government may decide to call witnesses from one or more of the identified businesses if the witness has additional information, beyond certification of the business records, that would be helpful to the jury's understanding of the records.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant the government's motions *in limine*.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:     */s/ Elizabeth R. Pozolo*
JEANNICE APPENTENG
ELIZABETH R. POZOLO
Assistant U.S. Attorneys
219 South Dearborn St., Rm. 500
Chicago, Illinois 60604
(312) 353-5300

Dated:  June 13, 2022